IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MICHAEL STINE,                                               CV 05-473 AS

               Plaintiff,                            OPINION AND ORDER

     v.

OREGON FEDERATION OF NURSES
& HEALTH PROFESSIONALS, LOCAL
5017, AMERICAN FEDERATIONS OF
TEACHERS, AFL-CIO, a labor organization;
KAISER FOUNDATION HOSPITALS, a
foreign nonprofit corporation; KAISER
FOUNDATION HEALTH PLAN OF THE
NORTHWEST, a domestic nonprofit
corporation,

               Defendants.

_____

ASHMANSKAS, Magistrate Judge:

## **INTRODUCTION**

    Plaintiff  brings this hybrid duty of fair representation claim against his former employer,

Kaiser Foundation Hospitals and Kaiser Foundation Health Plan of the Northwest ("Kaiser"),

and Oregon Federation of Nurses and Health Professionals, Local 5017 ("OFNHP"), his former union, *pro se*. Plaintiff also asserts a claim against OFNHP under the Labor-Management Reporting and Disclosure Act ("LMRDA"), 29 USC § 410, *et seq*. Defendants now move for summary judgment on all claims pursuant to *FRCP* 56(c) (# 63, 64).

In addition, plaintiff moves to reopen discovery (# 85). Defendant OFNHP moves to strike plaintiff's exhibits 1 and 5 (# 89). Plaintiff moves to strike Kaiser's Myer Decl., Ex. 6, pp. 1-39 (# 93). Plaintiff moves for summary judgment (# 100).

PRELIMINARY MOTIONS

I.  <u>Plaintiff's Motion to Reopen Discovery (# 85)</u>

The question of whether to reopen discovery to conduct additional discovery is within the court's discretion. *Cornwell v. Electra Central Credit Union*, 439 F3d 1018,1026 (2006). A district court abuses its discretion only if "'the movant diligently pursued its previous discovery opportunities, and if the movant can show how allowing additional discovery would have precluded summary judgment.'" *Chance v. Pac-Tel Teletrac Inc.*, 242 F3d 1151, 1161 n. 6 (9th Cir. 2001) quoting *Byrd v. Guess*, 137 F3d 1126 , 1131 (9th Cir. 1998).

Plaintiff contends that he should be allowed to reopen discovery in order to pursue evidence of any agreement between defendants and Patient M. Plaintiff argues that summary judgment for defendants would be precluded by evidence indicating that Patient M made false allegations about him for financial gain. In addition, plaintiff seeks all materials relevant to Kaiser's determination to revoke its claim that plaintiff's grievance was time barred. Pltf. Ex. 8. Plaintiff contends that such evidence will raise genuine issues of fact as to OFNHP's negligence in handling his grievance and show "collusion" between defendants. Pltf. Aff. p. 2.

Plaintiff filed this case on April 5, 2005.  Plaintiff's counsel withdrew in November 2005. On July 24, 2006, plaintiff requested an extension of the August 14, 2006, discovery deadline. That motion was denied by Order of August 3, 2006.

On September 12, 2006, plaintiff filed a "Request" to compel response to Interrogatories (# 59).  That "Request" was denied for, among other reasons, plaintiff's failure to confer with defense counsel in violation of Local Rule 7.l, and as untimely under Fed. R. Civ. P. 33(b)(3) and Local Rule 16(d).

Plaintiff sought production of any settlement agreement between Patient M and Kaiser in a Request served on April 5, 2006.  Kaiser objected, and plaintiff moved to compel (# 45). Plaintiff's motion was denied on September 6, 2006 (# 54).

Plaintiff filed this motion on November 14, 2006 (# 85).  The last day to serve discovery requests by hand was July 14, 2006.  This court has already denied plaintiff's request for any settlement agreement between Kaiser and Patient M.  Plaintiff offers no new argument that would support  reversing that decision.

As to the "materials referred to in the 9/30/04 letter (Exhibit 8, p. 1)," Kaiser contends that it has produced all nonprivileged documents.  Plaintiff has not established that reopening discovery would raise genuine factual issues sufficient to preclude summary judgment. Plaintiff's motion to reopen discovery (# 85) is denied.

II. OFNHP's Motion to Strike Plaintiff's Exhibits 1 and 5 (# 89)

Plaintiff's Exhibit 1 is a copy of a report of a polygraph examination of plaintiff.  The questions and answers concern whether plaintiff ever touched Patient M's breasts or asked her to remove any of her clothing.  Plaintiff's Exhibit 5 is a copy of the administrative decision of the

3  - OPINION AND ORDER

Employment Department of the State of Oregon regarding plaintiff's post-termination claim for unemployment compensation benefits.

OFNHP argues that the polygraph report is not relevant to the issue of whether OFNHP breached its duty of fair representation to plaintiff or violated his rights under the LMRDA. OFNHP concedes that it concluded that an arbitrator would find that plaintiff had touched Patient M's breast, and would probably uphold his discharge on that basis.  OFNHP notes that the Ninth Circuit has "held consistently that unions are not liable for good faith, non-discriminatory errors of judgment made in the processing of grievances." *Peterson v. Kennedy,* 771 F2d 1244, 1254 (9th Cir. 1985)(citations omitted).  To establish a breach of the duty where a judgment error has occurred, the plaintiff must show that the Union acted in bad faith or discriminated against him.  *Wellman v. Writers Guild of America West, Inc.,* 146 F3d 666, 670 (9th Cir. 1998).  OFNHP contends that whether or not plaintiff touched Patient M's breast or asked her to remove her clothing is not probative of whether OFNHP acted in bad faith or discriminated against him.

In addition, OFNHP contends that Exhibit 1 is not admissible under Federal Rule of Evidence 702.

Plaintiff argues that summary judgment is not appropriate if expert testimony supports the nonmoving party's case, and that the polygraph examiner qualifies as an expert in his field. Plaintiff contends that the polygraph evidence supports his allegation that OFNHP acted in bad faith when it determined not to take his grievance to arbitration.

It is not clear from the record whether plaintiff provided the results of the polygraph examination to his union representative.  The results were provided to the OFNHP Executive

Board when it determined not to take plaintiff's grievance to arbitration. However, this court has determined that polygraph evidence "is not reliable enough scientific knowledge to assist the trier of fact to understand the evidence or determine a fact in issue." *United States v. Microtek International Development Systems Div., Inc.,* 2000 WL 274091 at *6 (D OR 2000). The motion to strike plaintiff's Exhibit 1 is granted.

Plaintiff's Exhibit 5 is a copy of a January 2004 Administrative Decision of the Oregon Employment Department allowing unemployment compensation benefits. Under the heading "Findings of Fact" the document contains the statement that plaintiff "did not touch the client inappropriately." Pltf. Ex. 5.

OFNHP argues that this document is irrelevant for the same reasons as Exhibit 1. Plaintiff cites Exhibit 5 in his Opposition to defendants' Motions for Summary Judgment as a "formal finding of fact that the patient's allegation did not occur..." Pltf. Opposition, p. 3.

Plaintiff contends that Exhibit 5 should have convinced the OFNHP that his grievance should be taken to arbitration. Plaintiff suggests that Exhibit 5 is evidence that defendant Kaiser "came to an incorrect conclusion in this matter." Pltf. Motion in Opposition, p. 3.

Regardless of what the Oregon Employment Division found, the issue is whether OFNHP breached its duty of fair representation or violated plaintiff's rights under the LMRDA. The Motion to Strike Plaintiff's Exhibit 5 is granted. To the extent that plaintiff's Exhibits 1 and 5 were considered by the defendants in their decision making process, the court will consider them in assessing the defendants' conduct.

III. <u>Plaintiff's Motion to Strike Recordings and Transcripts (# 93)</u>

Plaintiff moves to strike the recordings of telephone conversations made by Patient M

and the transcripts of those recordings. Plaintiff argues that these materials may have been altered by Patient M in order to seek financial gain, and that Patient M is not available to verify that these are the recordings that she made.   Plaintiff argues that it was not proper for Kaiser to consider the tape recordings and transcripts in making its discharge decision.  Finally, plaintiff argues that one of the recordings may have been made on a telephone call placed from California, and is illegal under California law.

Kaiser contends that the CBA governing plaintiff's employment contains no provision restricting the evidence that Kaiser may consider when determining whether just cause exists for an employee's discharge.  Myers. Decl., Ex. 12 at 35, 48.  It is true that generally, in a grievance procedure, where there are no written restrictions on the evidence that may be considered, the employer may consider all relevant evidence, regardless of whether that evidence would be admissible under any rules of court.  *See, e.g., Harvey Aluminum v. United Steelworkers of America,*  263 FSupp 488, 490-91 (CD Cal 1967).

Kaiser argues that it reasonably relied on the transcripts and tape recordings in making the decision to discharge plaintiff.  Kaiser notes that it received the tapes and transcripts directly from the Gresham Police Department file.  Myers Decl. ¶¶ 7-10.  The police file indicates that the police made the transcripts from recordings of telephone calls that Patient M made under the Gresham police's direction, with equipment provided by the police.

Kaiser contends that the content of the transcripts establishes their authenticity, noting that one transcript begins, "This is the office of Dr. Michael Stein in the Mental Health Department at Eastman Parkway, can you hold just a moment?"  Myers Decl., Ex 6 at 1.  Finally, Kaiser points to the fact that plaintiff does not dispute that the transcripts and tape recordings are

of telephone calls placed to plaintiff's work number, and are recordings of Patient M's conversations with a man purporting to be plaintiff.  Plaintiff admitted at deposition that it is possible that he spoke with Patient M by telephone on the dates in question.  Barker Decl. Ex. 1 p. 7-8.  He admitted that the male voice sounds like his and the statements sound like the way he talks to patients. *Id.* p. 9, 30.

Kaiser properly considered the transcripts and tape recordings in making the determination to discharge plaintiff.  Plaintiff's motion to strike (# 93) is denied.

IV.  Plaintiff's Motion for Summary Judgment (# 100)

The deadline for filing summary judgment motions in this matter was September 26, 2006.  Plaintiff did not seek to have that deadline extended.  Plaintiff did not seek leave of the court prior to filing his motion for summary judgment on December 28, 2006.  Plaintiff did not confer with defense counsel prior to filing his motion, in violation of Local Rule 7.1(a).

"*Pro se* litigants must follow the same rules of procedure that govern other litigants." *King v. Atiyeh,* 814 F2d 565, 567 (9th Cir. 1987), citing  *United States v. Merrill,* 746 F2d 458, 465 (9th Cir. 1984),  *cert. denied,* 469 US 1165 (1985).  Plaintiff's motion for summary judgment (# 100) is denied as untimely.

Moreover, plaintiff submits argument but no evidence in support of his motion.  Because plaintiff is *pro se*, the court will consider all of the arguments he raises in his summary judgment motion as arguments in opposition to defendants' motions for summary judgment.

## LEGAL STANDARDS

Summary judgment is appropriate if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law.  *Fed R Civ P* 56(c).  The moving

party must show an absence of an issue of material fact.  *Celotex Corp. v. Catrett,* 477 US 317, 323 (1986).  Once the moving party does so, the non-moving party must go beyond the pleadings and designate specific facts showing a genuine issue for trial.  *Id* at 324.  The court must "not weigh the evidence or determine the truth of the matter, but only determines whether there is a genuine issue for trial."  *Balint v. Carson City, Nevada,* 180 F3d 1047, 1054 (9th Cir 1999).  A "'scintilla of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material fact.  *United Steelworkers of Am. v. Phelps Dodge Corp.,* 865 F2d 1539, 1542 (9th Cir), *cert denied,* 493 US 809 (1989), quoting *Anderson v. Liberty Lobby, Inc.,* 477 US 242, 249-50 (1986).

The substantive law governing a claim or defense determines whether a fact is material.  *T.W. Elec. Ser., Inc. v. Pacific Elec. Contractors Ass'n.,* 809 F2d 626, 630 (9th Cir 1987).  The court must view the inferences drawn from the facts in the light most favorable to the non-moving party.  Thus, reasonable doubts about the existence of a factual issue should be resolved against the moving party.  *T.W. Elec. Ser., Inc.,* 809 F2d at 630-31.  However, when the non-moving party's claims are factually implausible, that party must come forward with more persuasive evidence than would otherwise be required.  *California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.,* 818 F2d 1466, 1468 (9th Cir 1987), *cert denied*, 484 US 1006 (1988).

## FACTS

Because all material facts must be viewed in the light most favorable to the non-moving party, this court will view the evidence in the light most favorable to plaintiff.  The following is a

summary of the facts contained in the parties' supporting affidavits and deposition excerpts.[1]

Plaintiff's claims arise from Kaiser's August 15, 2003, termination of his employment as a mental health counselor for having allegedly molested a seventeen-year-old female patient during a therapy session and failing to notify Kaiser of the law enforcement investigation of that alleged molestation.

Plaintiff Michael Stine worked as a mental health counselor in the Mental Health Department at the Kaiser Permanente facility in Gresham, Oregon. Myers Decl. ¶ 1. Plaintiff's manager was David Myers, Ph.D., the Director of Outpatient Clinical Services for that department. *Id.*

The Collective Bargaining Agreement ("CBA") covering plaintiff's employment with Kaiser permits Kaiser to discharge plaintiff for just cause. Amended Complaint ¶ 9; Myers Decl. Ex 12. Kaiser discharged plaintiff for two reasons: (1) Kaiser believed that plaintiff initiated and engaged in inappropriate sexual touching of a seventeen-year-old female during a counseling session; and (2) plaintiff failed to report to Kaiser the police investigation of that incident. Myers Decl. Ex. 11.

Patient M[2]  was a seventeen-year-old female referred to plaintiff in his professional capacity as a mental health counselor for Kaiser in February 2002. Myers. Decl. ¶ 3. Plaintiff saw Patient M in his office on or about February 20, February 28, March 5, and March 14, 2002.

---

[1]Citations to affidavits and depositions are identified by the last name of the affiant or deponent, and citations are to the paragraph(s) of the affidavit or declaration, or page(s) of the deposition transcript. All other citations are to the exhibit number of the parties' submissions.

[2]For purposes of confidentiality, the parties have agreed to refer to the patient as Patient M and to redact any use of her name in the documents filed in this action.

*Id.*  Plaintiff's chart notes indicate that "relaxation techniques" were used during the March 14 appointment.  *Id.*

On March 18, 2002,  officers from the Gresham Police Department were contacted by an attorney and told that a client's niece had been "molested by her counselor."  Myers Decl. Ex. 5. The client, Phelps, reported the incident occurred the prior week.  Phelps told the attorney that Patient M told him that plaintiff had "placed a chair in front of the door and started rubbing her shoulders."  Phelps reportedly told the attorney that plaintiff had placed his hands under Patient M's shirt and fondled her breasts.

Officers interviewed Phelps that day.  He reported that he took Patient M to her counseling appointment on March 14, 2002.  Phelps met with plaintiff to discuss Patient M, and told plaintiff that Patient M had begun "acting weird" when he refused to have sex with her. Patient M called Phelps shortly after 5:00 p.m. and said "come get me now."  *Id.*  Phelps said it would be about ten minutes. Patient M stated "can't you just come get me now?"  Phelps said she sounded upset.  When he arrived Patient M "looked like she was in shock" and kept asking "what did you tell him?"  *Id.*  She stated that "Dr. Stein said he would write her a very good recommendation to help get her son back."  *Id.* Patient M told Phelps that she couldn't tell him what had happened because he would do something about it.  Patient M started crying as she told him about the sexual contact.

> [Patient M] reportedly told [the client] that she went back into Dr. Steins
> office and they started talking about what he and Dr[.] Stein discussed.
> [Patient M] said Dr. Stein told her they were going to do some physical
> contact therapy and he started rubbing her shoulders.  [The client] said he
> was unsure of exactly the time line of events but that Dr. Stein placed
> his hand up under [Patient M's] shirt and fondled her breasts.  [Patient
> M] said Dr. Stein got up and placed a chair in front of the door, closed
> the blinds, removed [Patient M's] shirt and had [Patient M] sit down on

> the floor in front of him and he again started massaging her breasts
> and her inner thighs and eventually her genitalia through her jeans.

Myers Decl. Ex. 5, p. 4-5.

Officers interviewed Patient M, separately, on the same day. She told the officers that she was legally emancipated, and had moved to Oregon from California with her son, after leaving her husband. Patient M stated that her ex-husband had "disappeared" with her son in August 2001, and she had received notice in November 2001 that her husband had obtained custody of the boy. Patient M reported that she was homeless and taking drugs including mushrooms, LSD, marijuana, ecstasy and crystal methamphetamine. She was working as a prostitute and stripper. She went to the emergency room in January 2002, and was prescribed Zoloft, Trazodone, and Restoril. Patient M told the officers that she had stopped using illegal drugs and alcohol after receiving medication.

Patient M reported to the officers that she first met plaintiff the day after her emergency room visit. She stated that she "really liked him" and thought he could help her. On Wednesday, March 13, 2002, she left a message at Kaiser for plaintiff to call her. Plaintiff called her on Thursday morning, and set an appointment for that afternoon. Phelps accompanied her to the appointment, and he spoke alone to plaintiff for about ten minutes. At about 4:30 p.m. she went back into plaintiff's office and "she thought it was odd because her time should have been up but Dr. Stein had asked her back into his office and Phelps had left saying he would return for her in about 30 minutes...." Myers Decl. Ex. 5, p. 6.

Patient M stated that the office door was closed, and they starting talking about her depression arising out of Phelp's refusal to have sex with her. She said that plaintiff told her that "physical contact promotes healing," that he had take a class in massage, and asked if she would

11  - OPINION AND ORDER

like him to massage her shoulders. *Id.* Patient M "told him that was okay," and plaintiff started massaging her shoulders. They were seated on a couch side by side. Patient M reported that she was wearing a tank top, and plaintiff slid his left hand under her shirt and placed it on the bare skin of her stomach. Plaintiff slid his right hand under her shirt and rested it on her back, then rubbed his left hand up over her breasts. Patient M stated that plaintiff pulled up on her shirt, saying "let's get this out of the way." *Id.* p. 7. She thought he meant to move the shirt off her back, so she pulled it so her back was exposed and her chest covered. Plaintiff pulled the shirt off over her head and continued rubbing her back, stating "I just want you to know I'll say whatever I can to help you get your son back. I will write you a really good recommendation." *Id.*

Patient M told the officers that plaintiff got up and placed a chair in front of the door, closed the blinds, and told her to get down on the floor. She said that plaintiff sat down behind her and pulled her backwards so that she was lying on the floor in front of him, and continued massaging her collarbone area. Patient M stated that plaintiff then pulled her bra straps down and massaged her breasts and stomach, stating "[O]h wow, look at that you have your nipples pierced. You would think that would hurt. My generation didn't do that." *Id.* Patient M stated that plaintiff moved so that he was sitting next to her and continued massaging her breasts and stomach with his left hand, and started massaging her inner thigh. He rubbed his hand across her crotch twice, through her jeans. Patient M then sat up, pulled up her bra straps and put her shirt back on while plaintiff got up and wrote an appointment reminder for the following Tuesday. Patient M stated that plaintiff had an erection, and that he was wearing brown pants and belt and a blue checked button down shirt. Plaintiff said "see you next Tuesday," and gave her a hug and

a kiss on the forehead.  He had not hugged or kissed her before.

Patient M told the officers that she called Phelps to come get her, that Phelps said he would be a few minutes, and she asked him again to come now.  She stated that she was afraid to tell Phelps what had occurred because she was afraid he would do something about it, and because she wanted the letter from plaintiff to use in her custody battle.  She was afraid that plaintiff would not write the letter if she told anyone what he had done.

Patient M reported that she did not tell plaintiff to stop, but was afraid of him because he had placed a chair in front of the door and she did not know what he was going to do.  She said she had told plaintiff that she would do anything to get her son back.

Patient M agreed to record telephone conversations with plaintiff and the officers provided her with a recording device.  Myers Decl. Ex. 9., p. 1.  Patient M recorded three telephone conversations in April and early May 2002.  Transcriptions of the calls are Myers. Decl. Ex. 6.

Patient M's medical files were released to the Police Department on about October 9, 2002.

On October 31, 2002, officers of the Gresham Police Department interviewed Plaintiff. At the request of an officer, plaintiff voluntarily appeared at the police department.  Myers Decl. Ex. 8.  Plaintiff told the officers that he had seen Patient M three or four times.  Asked if he ever used any type of therapy that required touch, plaintiff described Eye Movement Desensitization and Reprocessing ("EMDR"), a therapy in which the palms are tapped while resting on the knees.

Officers told plaintiff that there were allegations of touching the breasts.  He denied

13  - OPINION AND ORDER

rubbing Patient M's shoulders.  Asked to describe Patient M, plaintiff said she was troubled, with verbal hallucinations, visions, and difficulty identifying reality.  He told the officers that Patient M had a three-year-old child, and that she abused illegal drugs.  He guessed her age to be approximately 19.  He said she had been a prostitute and suicidal, and might have carved her son's name into her arm.

Plaintiff told the officers that he believed that Patient M thought his treatment was helping her, and that she was obsessed with gaining custody of her son.  He thought she had gone to California to fight for custody, and was surprised that she was in Oregon.  Plaintiff stated that the child's father had threatened to take the child to the southern United States.

Plaintiff stated that he did not believe Patient M was infatuated with him.  He said "at least three times" that he had not seen or heard from her since the last therapy session.  He could not recall whether Patient M dressed provocatively, but stated that she had multiple piercing in the ears, nose and perhaps the lip or tongue.  He did not recall talking to any of Patient M's friends or family.

On December 5, 2002, plaintiff was interviewed again at the Gresham Police Department.  He was advised of his "Miranda" rights.  The officer reported that plaintiff initially denied speaking on the telephone with Patient M since her last counseling session., but later stated that he might have spoken with her about rescheduling missed appointments.  He denied discussing "touch therapy" with Patient M, and said he had never heard of it.  Plaintiff said he had not touched Patient M except that he might have shaken her hand at the end of a session.  He described Patient M as "edgy," with multiple piercings in her lip, nose and ears.  He denied knowledge of any other piercing on Patient M.  Plaintiff described Patient M as hearing voices,

14  - OPINION AND ORDER

and said that she had been "actively psychotic" during a session.  Myers Decl. Ex. 9, p. 3.

Plaintiff told the officers that he had not heard from Patient M for a long time.  Asked

why Patient M was alleging that he touched her breasts, plaintiff stated "My theory is, she is

seeing a new counselor and she came up with this new delusion."  *Id.* pp. 3-4.  The officer

reported:

> I then had two tape recordings set to play specific parts of the
> taped conversations between him and victim.  I played the first
> one where the touch therapy is talked about and where suspect
> advised victim it was "unique" between them.
>
> I then played the area of taped interview discussing the piercings
> again between suspect and victim.  The suspect was shaking when
> I finished playing the tapes.  Suspect stated "what's that!?"  I ad-
> vised him the tapes were of him and victim talking on the telephone.
> Suspect said the tapes were "fabricated" I advised suspect the tapes
> were my tapes and the recording equipment provided to victim by
> us and he stated "you did this to me?"

Myers Decl. Ex. 9, p. 4.  Plaintiff exercised his rights by advising the officers that he would not

talk further without an attorney, and the interview ended.  Officers advised plaintiff that they

would refer the matter to the District Attorney.

In unsworn briefing, plaintiff contends that neither of his meetings with Gresham Police

Department officers constitute an "investigation" which must be reported to his employer under

the terms of the CBA.  Plaintiff notes that the meetings were at times and places of his choosing,

and that at the second meeting the police went to "great lengths" to assure him that the

"Miranda" warnings were routine and that he was not being charged with any offense.

On January 27, 2003, Patient M contacted Kaiser to report that plaintiff had inappropriate

conduct of a sexual nature with her during her March 14, 2002, appointment, and that she had

previously reported this to the police.  Myers. Decl. Ex. 2.  Myers wrote that he spoke with

Patient M by telephone:

> In summary, she said that during her last therapy session with
> Mike Stine, he told her that physical touch promoted healing
> and that he had been trained in massage.  With her consent, he
> then began giving her a massage.  After he started the massage,
> his hand 'roamed around to her stomach and brushed over her
> breasts'.  Then he got up and closed the shades and put a chair
> in front of the door.  Then he continued the massage while
> telling her that he would write a really good letter for her to get
> her son back.  His hand went under her shirt and then he took
> her shirt off.  She said 'it continued from there....'  But she did
> not give any more details.  She said she would describe all the
> details in her complaint letter.  She said that she immediately
> reported this to her friend who picked her up after the session.

> She said that she reported this to the police.  The police then
> coached her to talk to Mike Stine on the phone and tape re-
> cord the call.  She said that she did do this and in the conver-
> sation on the phone Mike Stine alluded to the massage incident
> in several ways.

> . . .

> I would add that this member reports this in a very convincing
> manner.  She sounded audibly shaken as she told her story.

> We also want to give Mr. Stine a fair opportunity to defend
> himself and tell his side of this story.

*Id.*

There is no evidence in the record that Patient M ever filed a written complaint with

Kaiser.

Holly Crabb, the Equal Employment Opportunity Coordinator for Kaiser, prepared notes

of a January 30, 2003 meeting.  Crabb, plaintiff, Myers, and Barry Jacobson, plaintiff's

supervisor, attended.  Crabb wrote:

16  - OPINION AND ORDER

The purpose of this meeting was to review the complaint with
Mr. Stine, listen to his recollection of events, ask him questions
regarding the allegations, provide him the opportunity to ask
questions, and advise him that he would be placed on paid
administrative leave during the investigation.  Prior to the
meeting Mr. Stine was advised on two occasions by his super-
visor, Barry Jacobson, that he was entitled to union representa-
tion.  Mr. Stine declined representation on both occasions.  Be-
fore we started the meeting, Mr. Stine was advised that if he
changed his mind and wanted union representation to let us
know and we would reschedule the meeting.

. . .

The complaint as outlined in Mr. Meyer's email was
reviewed with Mr. Stine.  He stated that it did not happen, and
it was a regular session.  He described [Patient M] as a strange
woman who was delusional and heard voices, fixated on her
son who had been taken away from her by the child's father,
and she was suicidal.  He also stated that she was reluctant to
take the medication prescribed for her by her treating psychiatrist.

. . .

Mr. Stine was then asked if he had a conversation with [Patient
M]  after this lst session in 3/02.  He said she called him from
California (apparently she was a visiting member from Califor-
nia and was there to attempt to get her son back).  He said she
asked him how she would go about getting another therapist, told
him she wanted the same kind of therapy she had with him, and said
she felt appreciated by him and close to him.  He was then asked if
there was anything alarming to him about this conversation or if she
referenced anything from past sessions that he felt uncomfortable
about.  There was a long pause before he answered.  He said he told
her he was not comfortable talking about this on the phone (feeling
close to him).  He was then asked if he wanted this conversation to
take place face to face with her.  He said no and stated that he offered
to be her therapist again when she returned to Oregon.

He was then asked if he offered to write a letter to help get her son
back.  He said he might have told her, if she signed a release, he
could write a letter regarding her progress in therapy and getting
her life together.  He was asked if he talked about touching or
massage as an effective way to promote healing.  He was also

17  - OPINION AND ORDER

asked if he had been trained in massage.  He responded no to both
questions. He did say he had done some reading about massage.
He was then asked if he closed the blinds in his office and moved
a chair in front of the door.  He said the blinds are always closed
during his sessions with patients and he did not move a chair in
front of the door.

. . .

We asked him if he had been contacted by the police.  He said
they contacted him in October of 2002.  He said he was asked
the same type of questions he was being asked in this meeting
and provided the same responses....He was then asked why he
did not inform his employer that this had happened.  He said he
was concerned but this was so far fetched, absurd, and ridiculous.
He said it was no big worry and expected that the police would
see how absurd this was and the issue would go away because it
never happened.  He also knew that the police had requested this
patient's records and did not report this to management.  We
asked what the police said to him that made him think this would
not be pursued.  He said it never happened and the police would
see this.

Myers Decl. Ex. 3.

        Kaiser placed plaintiff on paid administrative leave, and put its internal investigation on

hold because the Gresham Police Department would not release its file until it closed its criminal

investigation.  Myers Decl. ¶ 7.

        In late January or early February plaintiff contacted Debbie Silva, an Internal Organizer

for OFNHP.  Silva Decl. p. 1-2.  Silva advocates for Union members and handles grievances.

She met with plaintiff weekly through the spring of 2003, and worked with his attorneys and

Kaiser Human Resources officials as plaintiff's advocate.  *Id.*  at 3.

        On February 12, 2003, plaintiff submitted to a polygraph examination.  The examiner

concluded that plaintiff's negative responses to questions as to whether he had touched Patient

M's breast or asked her to remove her clothing were not indicative of deception.  Pltf. Ex. 1.

18  - OPINION AND ORDER

On June 10, 2003, Kaiser received a copy of the Gresham Police Department's file. Myers Decl. Ex. 4.  On June 17, 2003, the District Attorney's office notified plaintiff's counsel that it would not prosecute.  Pltf. Response, p. 19.

On June 27, 2003, Kaiser provided the police reports and transcripts of the telephone conversations to Silva.  Silva Decl., p. 3.  Silva objected to the investigatory process and sought clarification about whether the investigator was an outside party.  Silva objected to the lack of advance notice of an investigatory meeting and delayed delivery of requested documents.  *Id.*

On July 8 and 16 Kaiser held investigatory meetings with plaintiff, his attorney and Silva. At the first meeting Kaiser investigator Juanita Evans and Kaiser in-house attorney Daniel Fritz questioned plaintiff.  Plaintiff admitted that he recalled speaking with Patient M on the telephone after her last therapy session.  Plaintiff admitted that the male voice on the tape sounded like him, but stated that he did not have an independent recollection of the conversations.  Pltf. Depo. 225; 253.  When Kaiser investigators started to question plaintiff about the conversations, Silva interrupted and asserted that the Union did not agree that it was plaintiff's voice on the tape. Silva suggested that the tapes may have been altered.  Mechanic Aff., Ex. 14, 15.  At Silva's request, Kaiser provided copies of the tapes to her.

On July 17, 2003, Myers reviewed the police reports and the transcripts of the telephone conversations between Patient M and a man purporting to be plaintiff.  Myers. Decl. Ex. 10,  pp. 1-6.  In a memorandum apparently to his supervisor, Myers noted that plaintiff had consulted with Myers on several occasions with respect to potential legal issues, and that plaintiff knew to consult with a supervisor when he was contacted by the police.   Myers asserts that plaintiff inappropriately revealed confidential information about his patient to the police without written

authorization.  *Id.*  at 2.  Myers quotes portions of the transcripts which he states indicate a personal, unethical,  unprofessional relationship with the patient, and portions which he believes indicate that the speaker has done something he does not want his "company" to know about.

On July 24, 2003,  David J. Lilly, Ph.D., of  Cascade Audiometrics, Ltd., wrote to plaintiff's criminal attorneys regarding the quality of the telephone recordings.  Plaintiff asserts that the letter casts doubt on the validity of the telephone recordings in that "the clarity of the recording is not indicative of the sound quality at the receiving end at the time the recording was made."  Pltf. Ex. 3, p. 2.

On August 15, 2003, plaintiff was terminated by Kaiser for two reasons: (1) initiating and engaging in inappropriate touching with a patient; and (2) failing to report to Kaiser that he was under investigation for sexual abuse of a patient.  Myers Decl. Ex. 11.

On August 17, 2003, Silva, acting for the Union, filed a grievance on plaintiff's behalf, arguing that his termination was without just cause.  Silva Decl. Ex. 3.   Plaintiff testified that Silva and the OFNHP asserted the positions that he wanted them to.  Pltf. Depo., p. 342. Another Organizer for the Union assisted plaintiff in obtaining unemployment benefits.  Plaintiff testified that this person was "extremely helpful."  Pltf. Depo., p. 349.

On December 17, 2003, Silva represented plaintiff at a "third step grievance meeting," arguing that there was no "just cause" for plaintiff's termination because plaintiff had not engaged in the behavior of which he was accused.  Mechanic Decl. Ex. 17.  In addition, Silva argued that the criminal charges had been dropped, and that plaintiff's failure to report the police investigation to Kaiser was not a violation of any Kaiser policy.  *Id.* Kaiser rejected these arguments by letter dated January 22, 2004.

20  - OPINION AND ORDER

On January 2, 2004, the Oregon Employment Division found that plaintiff was entitled to unemployment insurance benefits. Pltf. Ex. 5. The agency found that plaintiff was discharged because of a client complaint, that the client reported to the police that the plaintiff had touched her inappropriately during a session, and that the plaintiff did not touch the client inappropriately. *Id.*

Plaintiff and Silva remained in contact through the summer of 2004. On August 24, 2004, plaintiff's grievance was reviewed by the OFNHP Executive Board. Silva argued on plaintiff's behalf. The Board members reviewed the evidence, including the tapes and the transcripts, and voted unanimously not to take the case to arbitration.

On September 25, 2004, at plaintiff's request, the Executive Board reconsidered its decision not to take Plaintiff's grievance to arbitration. Plaintiff admits that he was allowed to submit all materials he thought relevant to his case. Pltf. Depo., pp 325-26. Plaintiff presented a number of professional references and the results of the polygraph examination. Mechanic Aff., Ex. 20, p. 3. Plaintiff and his attorney were given one-half hour to present plaintiff's case and ask questions. *Id.,* Ex. 19, 20. The Executive Board allotted one-half hour for the Board to ask plaintiff questions. Plaintiff did not request more time. Pltf. Dep., pp. 235-26. Before the meeting, a sub-committee of Board members listened to the tapes of the telephone conversations. Mechanic Aff., Ex. 20, p. 3. Plaintiff admitted that, based on the similarity between his voice and the male voice on the tapes, the Board members could reasonably have concluded that the male voice on the tapes was plaintiff. Pltf. Depo., p. 374.

Counsel to the Executive Board, Gene Mechanic, attended the September 25 meeting. Mechanic reviewed the Union's file concerning the grievance, including the police reports and

the transcripts of the recorded conversations.  Mechanic Aff. ¶¶ 4-6.  After plaintiff left, the

Board deliberated whether to change its decision and allow plaintiff's grievance to go to

arbitration.  During the deliberations, Mechanic advised the Board that an arbitrator would likely

find that Kaiser lacked just cause to discharge plaintiff for failing to report the police

investigation. Mechanic also advised the Board that an arbitrator would likely uphold the

discharge based upon plaintiff's alleged misconduct with Patient M.  Mechanic advised the

Board that the evidence supported Patient M's allegations and that the grievance would probably

be lost on that ground.  Mechanic Aff. ¶ 13, Ex. 20, p. 8.  Based upon Mechanic's advice,

plaintiff's responses at the meeting, and the sub-committee's review of the taped conversations,

the Executive Board decided not to arbitrate.  Geroux Decl. ¶ 5.

By letter dated October 7, 2004, the Union informed plaintiff that the Board had affirmed

its decision not to proceed to arbitration with plaintiff's case because the Board concluded that an

arbitrator would uphold plaintiff's discharge.  Mechanic Aff., Ex. 21.  On October 11, 2004, the

Union informed Kaiser that it wished to withdraw the grievance.  *Id.* Ex. 22.

On February 10, 2005, the Oregon State Board of Licensed Professional Counselors and

Therapists entered into a Stipulated Final Order with plaintiff in which it found that "Patient M

recorded three phone calls made to Licensee [plaintiff]," and that plaintiff was negligent in his

role as Patient M's counselor in that he did not make a reasonable effort to advance the welfare

and best interest of the client during those conversations.  Mechanic Aff., Ex. 23.  The Board

reprimanded and fined plaintiff, and required him to receive personal therapy for one year.  In

addition, plaintiff agreed to limit his therapy practice to adults and "families as a group" for a

period of two years.  *Id.*

22  - OPINION AND ORDER

DISCUSSION

I. The Collective Bargaining Agreement

A union owes a duty of fair representation to those it represents, and an employer must honor the terms of a collective bargaining agreement ("CBA") to which it is a party. An aggrieved party may bring a hybrid fair representation/§ 301 suit against the union, the employer, or both. In order to prevail in any such suit, the plaintiff must show that the union and the employer have both breached their respective duties. *Bliesner v. The Communication Workers of America,* 464 F3d 910, 913 (9th Cir. 2006).

The Supreme Court has described a hybrid fair representation/§ 301 suit as follows:

> Such a suit, as a formal matter, comprises two causes of action. The suit against the employer rests on § 301, since the employee is alleging a breach of the collective bargaining agreement. The suit against the union is one for breach of the union's duty of fair representation, which is implied under the scheme of the National Labor Relations Act. Yet the two claims are inextricably interdependent. To prevail against either the company or the Union,...[employee-plaintiffs] must not only show that their discharge was contrary to the contract but must also carry the burden of demonstrating breach of duty by the Union.

*DelCostello v. Int'l Bhd. of Teamsters,* 462 US 151, 164-65 (1983)(citations and internal quotations omitted; alteration in the original). Whether the defendant is the union or the employer, the required proof is the same: The plaintiff must show that there has been both a breach of the duty of fair representation and a breach of the CBA. *Id.*

However, nothing requires the court to decide the fair representation question first. *Bliesner,* 464 F3d at 914. Breach of the duty of fair representation by the union is a necessary prerequisite to a successful suit against the employer for a breach of the CBA. *Id.* It is also true that a hybrid fair representation/§ 301 suit cannot go to trial without some showing that the union

has violated its duty of fair representation. *Herman v. United Bhd. of Carpenters & Joiners of Am., Local Union No. 971,* 60 F3d 1375 (9th Cir 1995)( allowing hybrid suit to go forward when plaintiff could survive a summary judgment motion on issue of fair representation).

Kaiser contends that, even construing the facts in favor of plaintiff, his termination did not violate the CBA as a matter of law. Plaintiff contends that Kaiser violated the CBA by terminating him without "just cause." The CBA does not define "just cause." Kaiser points to decisions from other courts in which the evaluation of "just cause" typically includes consideration of the adequacy of the employer's investigation, the sufficiency of the evidence establishing that misconduct occurred, and the appropriateness of the penalty imposed. *Kar Nut Prod. Co. v. Int'l Bhd. of Teamsters,* 1 F3d 1241 (table), 1993 WL 304467, at *3, *2 (6th Cir 1993) (unpublished)(upholding decision of arbitrator when the agreement "did not define 'just cause,'" and when "arbitrator reasoned that 'just cause' incorporated two elements: (l) a proven offense, and (2) a reasonable and appropriate penalty.") *See also In re Oahu Transit Servs.,* 122 Lab. Arb. Rep. (BNA) 161 (2005) (Najita, Arb.)(employer had just cause to discharge bus driver who sexually harassed minor female passenger because investigation was fair and objective, there was substantial evidence of the employee's guilt, and the penalty imposed was appropriate).

A. Adequacy of the Investigation

Plaintiff testified that it was appropriate for Kaiser to take Patient M's allegations seriously, that Kaiser acted promptly to investigate the allegations, and that the Kaiser investigators had no ulterior motive or animosity against him. Pltf. Depo., pp. 126-27; 199-200; 234-35. He stated that he was given an opportunity to respond to the evidence against him, that there was no evidence or argument that he did not get to present, that the Kaiser representatives

listened to his side of the story, and that he had seven months and three meetings in which to present his side of the story.  *Id.,* at 242; 269.  Plaintiff was repeatedly informed that he had the right to have a Union representative with him for each of his meetings with Kaiser.  He had both a Union representative and a criminal defense attorney present during the last two meetings.  *Id.* at 187; 224; 241.

Plaintiff argues that Kaiser's in-house counsel, Fritz, "kept important exculpatory material from the person who made the decision to terminate" him (Myers), including the February 2003 Polygraph Report, a July 2003 investigation report "demonstrating Patient M's history of lying and deception," and the July 2003 audiologist's report.  *Id.*  Pltf. Response to the Defendant Kaiser's Concise Statement of Material Facts, p. 2.  However, plaintiff admits that the results of the polygraph examination were received by the Executive Board.

Plaintiff contends that Kaiser's motive for discharging him was retaliatory and intended to prevent negative publicity.  There is no evidence to support this argument. The evidence indicates that Kaiser's investigation of the allegations against plaintiff was methodical and adequate.

B.  Evidence of Misconduct

One of the grounds for plaintiff's discharge was Kaiser's determination that plaintiff engaged in inappropriate touching of a patient during a counseling session.  Kaiser considered the police reports and audio tapes, the reports of Patient M, and the assertions of plaintiff. Plaintiff has testified that Dr. Myers, who made the discharge decision, genuinely believed that such behavior occurred.  Pltf. Depo. at 279.  However, in his unsworn brief plaintiff now asserts that he does not know what Dr. Myers believed.  Pltf. Memorandum in Opposition, p. 4.

Regardless, there is substantial evidence that the misconduct occurred.

A second basis for plaintiff's discharge was his failure to report to Kaiser the police investigation of the allegations. Myers Decl. Ex. 11. There is no factual dispute. Plaintiff agrees that he did not disclose that he had been contacted by the police in October and December 2002 until the January 29, 2003 meeting. Plaintiff provides some evidence that the language of the Criteria For Treating Members has been changed at some point to provide that "any investigation" must be reported by a practitioner, as opposed to "formal investigations." Pltf. Ex. 6. However, by the December 2002 meeting between plaintiff and the police, during which plaintiff was advised of his "Miranda" rights, learned of the audio tapes of telephone conversations, exercised his right not to proceed without counsel, and was advised that the matter would be referred to the District Attorney, the officers' conduct was clearly a formal investigation by any definition. Plaintiff's failure to disclose the investigation to Kaiser following the December 2002 police interview constituted misconduct under Kaiser's written policies. This is particularly true when the conduct under investigation occurred during plaintiff's job performance and was completely entwined with plaintiff's professional responsibilities to Kaiser.

C.  Reasonableness of the Penalty

Kaiser's decision to discharge plaintiff from his position as a mental health counselor was reasonable when Kaiser had substantial evidence to support the conclusion that plaintiff had had inappropriate physical contact and an unprofessional relationship with a minor patient.

Plaintiff argues that discharge was not a reasonable penalty for failure to report the police investigation. Plaintiff contends that Mechanic advised the Executive Board that an arbiter

might find in plaintiff's favor on the failure to report the police investigation.  To the extent that

Mechanic so advised the Executive Board, this court disagrees.  The allegations of misconduct

that were the subject of the investigation go to the very heart of the patient and provider

relationship, and were without doubt of vital interest to plaintiff's employer.  Given the nexus

between the allegations and plaintiff's job performance,  plaintiff's failure to report the

investigation to Kaiser would support discharge.

There is no genuine issue of material fact.  Because plaintiff cannot establish that he was

discharged without "just cause" within the meaning of the CBA, his fair representation/§ 301

claim fails against the Kaiser defendants and OFNHP.

II.  <u>The Duty of  Fair Representation</u>

The Union's "duty of fair representation is inferred from [its] exclusive authority under

the National Labor Relations Act, 29 USC § 159(a), to represent all employees in a bargaining

unit, and [requires it] 'to act fairly when dealing with an employer on behalf of a member.'"

*Stevens v. Moore Business Forms, Inc.,*  18 F3d 1443, 147 (9th Cir. 1994)(*quoting Moore v.*

*Local Union 569 of the Int'l. Bhd. of Elec. Workers,*  989 F2d 1534, 1541 (9th Cir. 1993)).

Courts in the Ninth Circuit use a two-step analysis to determine whether a union has

breached its duty of fair representation:

> First, we must decide whether the alleged union misconduct
> involved the union's judgment, or whether it was procedural
> or ministerial.  Second, if the conduct was procedural or
> ministerial, then the plaintiff may prevail if the union's
> conduct was arbitrary, discriminatory, or in bad faith.  However,
> if the conduct involved the union's judgment, then the
> plaintiff may prevail only if the union's conduct was discrim-
> inatory or in bad faith.

*Wellman v. Writers Guild of American, West, Inc.,*  146 F3d 666, 670 (9th Cir. 1998)(*citing*

*Marino v. Writers Guild of America, East, Inc.,* 992 F2d 1480, 1486 (9th Cir. 1993).

"[I]n general, a union's decision about how best to handle a grievance" is viewed as "a matter of its judgment."  *Wellman,*  146 F3d at 671.  Similarly, a "[a] union's decision not to arbitrate a grievance that it considers to be meritless" is viewed as "an exercise of its judgment." *Id. (citing Stevens,* 18 F3d at 1447).  Therefore, to establish a breach of the duty of fair representation by a union's decision as to how to handle a grievance requires showing either that the union acted in bad faith or discriminated against the plaintiff.

A union must perform "some minimal investigation and preparation of employee grievances," but the grievance process "need not be error free."  *Johnson v. US Postal Service,* 756 F2d 1461, 1465-66 (9th Cir 1985).  Even a grievance process where the decision makers do not hear evidence does not amount to arbitrary, discriminatory, or bad faith conduct by the union.

It is undisputed that before making the decision not to arbitrate, the OFNHP Executive Board deliberated the issue and heard from plaintiff and his attorney.  Plaintiff acknowledges that he was allowed to submit all of the evidence he wanted to and to make all statements he wished to the Board.

Plaintiff argues that discrimination and bad faith are shown by the actions of Debbie Silva, OFNHP President Kathleen Geroux, and Katherine Schmidt.  He contends that they held a "personal retaliatory motive against plaintiff due to his advocacy and leadership role in a union organizational effort for Professional Group employees, and such motive was a substantial motivating factor in the union's decision not to proceed to arbitration on behalf of plaintiff." Plaintiff's Am. Comp. ¶¶ 13, 15.

28  - OPINION AND ORDER

At deposition, plaintiff was questioned about evidence of retaliatory discrimination. He admitted that he has none. Pltf. Depo. pp. 72, 85-86. Plaintiff took no depositions and did not obtain any answers to interrogatories. Plaintiff contends that evidence of discrimination consists of "perceived" hostility from Silva, Geroux and Schmidt, and from the Executive Board's initial decision not to take his case to arbitration before he had appeared before it. Plaintiff argues that his objection to having Ms. Silva represent him was not acted upon, and that his request that Silva be replaced as his OFNHP representative by Ed Taub was ignored. *Id.*

Geroux asserts that she has had no conversations with Schmidt regarding plaintiff since completion of negotiations for the CBA on February 25, 2002. Geroux Decl., p. 2. Schmidt also states that she has not had any conversations regarding plaintiff since negotiations were completed in February 2002. Schmidt Decl., p. 2.

There is no evidence that OFNHP acted in bad faith or arbitrarily in deciding not to take plaintiff's grievance to arbitration.

III.  The Labor-Management Reporting and Disclosure Act

The Labor-Management Reporting and Disclosure Act ("LMRDA") functions to "ensure that unions [are] democratically governed, and responsive to the will of the union membership as expressed in open, period elections. *Sheet Metal Workers' Intern. Ass'n v. Lynn,* 488 US 347, 354 (1989)(internal quotations omitted).

When a union member alleges that he has been retaliated against on the basis of protected speech under the LMRDA, he must show that his conduct constituted free speech within the meaning of the LMRDA and that the speech was cause for the union's action against him. *Commer v. McEntee,* 121 FSupp2d 388, 396 (SDNY 2000).

29  - OPINION AND ORDER

Plaintiff alleges that he was retaliated against for exercising his free speech rights while serving on the Professional Employees Collective Bargaining Committee in 2001-02. Specifically, he advocated that mental health care providers be paid the same as medical social workers.  Plaintiff contends that he got into serious arguments with Katherine Schmidt, the Union's Chief Spokesperson and OFNHP's former president, during negotiations.  Plaintiff alleges that OFNHP retaliated against him by failing to take his termination grievance to arbitration and by failing to meet a deadline for requesting arbitration with Kaiser.

As set out above, plaintiff has no evidence to raise an issue of fact.  The CBA was signed in February 2002.  The alleged misconduct occurred in March 2002, and plaintiff was terminated in August 2003.

<u>CONCLUSION</u>

For the reasons set forth above, defendants' Motions for Summary Judgment (# 63, 64) are granted as to all claims and this case is dismissed.

DATED this 30th day of January 2007.


 /s/Donald C. Ashmanskas
DONALD C. ASHMANSKAS
United States Magistrate Judge


30  - OPINION AND ORDER